RENDERED: DECEMBER 17, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0058-DG
2019-SC-0209-DG

COMMONWEALTH OF KENTUCKY, EX
REL. J. MICHAEL BROWN, SECRETARY OF
THE GOVERNOR'S EXECUTIVE CABINET

APPELLANT/CROSS-APPELLEE

V.

ON REVIEW FROM COURT OF APPEALS
NO. 2016-CA-0221
FRANKLIN CIRCUIT COURT NO. 10-CI-00505

STARS INTERACTIVE HOLDINGS (IOM)
LTD., F/K/A AMAYA GROUP HOLDINGS
(IOM) LTD. AND RATIONAL
ENTERTAINMENT ENTERPRISES, LTD.

APPELLEES/CROSS-APPELLANTS

**OPINION OF THE COURT BY JUSTICE WRIGHT**

**<u>REVERSING</u>**

This case originated as an action in Franklin Circuit Court brought

pursuant to Kentucky's Loss Recovery Act, Kentucky Revised Statutes (KRS)

Chapter 372. The trial court granted summary judgment in favor of

Appellant/Cross-Appellee and Appellees/Cross-Appellants appealed to the

Court of Appeals. The Court of Appeals reversed, holding there was no

standing under the Loss Recovery Act in the present case. Appellant/Cross-

Appellee petitioned this Court for discretionary review, and we granted the

motion. Thereafter, Appellees/Cross-Appellants filed a cross-motion for

discretionary review, which we also granted. Because we disagree with the

Court of Appeals' construction and interpretation of the Loss Recovery Act, we reverse its holding that "person" is limited to a natural person and that the Commonwealth lacked standing to bring this suit. Since we reverse the Court of Appeals' holding on this issue, we must address the remaining issues in the parties' appeal and cross-appeal.

## I. BACKGROUND

In 2010, Appellant/Cross-Appellee, the Commonwealth of Kentucky, through the Secretary of the Justice and Public Safety Cabinet, John Tilley, filed the underlying complaint in Franklin Circuit Court against Pocket Kings, Ltd. and "Unknown Defendants"[1] seeking to recover under Kentucky's Loss Recovery Act.

In bringing suit, the Commonwealth relied on portions of the Loss Recovery Act, including KRS 372.020 and KRS 372.040. KRS 372.020 provides a losing gambler with a first-party cause of action to recover any losses suffered. It reads:

> If any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery. Recovery may be had against the winner, although the payment, transfer or delivery was made to the endorsee, assignee, or

---

[1] Before the trial court, the Commonwealth filed multiple amended complaints. Because the number of defendants named in the complaints is extensive, we find it helpful to identify the few that we will discuss in detail: Oldford is the holding company that owns PokerStars and the group of subsidiaries that perform various roles in the PokerStars business. REEL is wholly owned by Oldford and operates PokerStars. In 2014, Oldford changed its name to Amaya Group Holdings (IOM) and subsequently Amaya Gaming Group Inc. acquired it.

2

> transferee of the winner. If the conveyance or transfer was of real estate, or the right thereto, in violation of KRS 372.010, the heirs of the loser may recover it back by action brought within two (2) years after his death, unless it has passed to a purchaser in good faith for valuable consideration without notice.

*Id.* If a losing gambler fails to bring a recovery action under KRS 372.020 within six months, KRS 372.040 permits a third-party cause of action to be brought against the winning gambler by "any other person" and allows for the recovery of treble damages. It reads:

> If the loser or his creditor does not, within six (6) months after its payment or delivery to the winner, sue for the money or thing lost, and prosecute the suit to recovery with due diligence, any other person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment.

*Id.*

In this case, the Commonwealth of Kentucky filed a civil lawsuit to recover statutory treble damages for money lost by its citizens playing real-money poker on an illegal internet website called PokerStars, which is owned by Appellees (collectively referred to as PokerStars). PokerStars does not participate as a player in the real-money poker games played on its site; instead, a "rake" is charged. A rake is a portion of the amounts wagered during the poker game. PokerStars charged a rake on the poker hands played on its website. Kentuckians lost at least $290,230,077.94 in the five years prior to the filing of this lawsuit (representing but a fraction of the amount of real dollars lost by Kentuckians over the entirety of PokerStars' operating history in Kentucky).

3

In 2001, the criminal syndicate that ran PokerStars began operation of its internet-based gambling website from Costa Rica and later moved to the Isle of Man, a small island in the middle of the Irish Sea. In 2006, Congress enacted the Unlawful Internet Gambling Enforcement Act, a powerful tool for prosecution of illegal internet gambling. 31 U.S.C. §§ 5361-5367. Section 5361 of the Unlawful Internet Gambling Enforcement Act provides the purpose of the Act, stating in pertinent part: "(4) New mechanisms for enforcing gambling laws on the Internet are necessary because traditional law enforcement mechanisms are often inadequate for enforcing gambling prohibitions or regulations on the Internet, especially where such gambling crosses State or national borders."

The Commonwealth of Kentucky began investigating unlawful online gambling and the damage it was doing to the citizens of the Commonwealth in 2007 during the administration of then-Governor Ernie Fletcher. In 2008, during the administration of then-Governor Steve Beshear, the Commonwealth filed an *in rem* action in Franklin Circuit Court targeting the internet domain names owned and registered by operators of offshore internet gambling.

In 2010, the Commonwealth of Kentucky filed the underlying case before the Franklin Circuit Court seeking recovery of gambling losses by Kentucky citizens along with treble damages as allowed by KRS 372.040. In April 2011, the U.S. Department of Justice unsealed indictments against PokerStars, its founder, and others for criminal violations of the Unlawful Internet Gambling Enforcement Act, and PokerStars' deposits of gambling funds in the United

4

States were frozen. PokerStars had survived and even flourished under every enforcement effort until its capital funds were frozen, which finally led to the cessation of its illegal operations in the United States.

During the pendency of this matter before the trial court, PokerStars refused to produce its Kentucky data for five years. The Commonwealth filed a motion for summary judgment based on evidence from their expert witness, an economist. At that point, PokerStars finally offered to turn over its Kentucky gaming data after the 5-year limitation to sue the other winners had expired. The other winners are the individual players who conspired with PokerStars to violate the gambling laws and from whose winnings PokerStars took their rake or percentage of the winnings. The Franklin Circuit Court entered partial summary judgment against defendants REEL and Oldford on liability and a default judgment against defendants Amaya Group Holdings (IOM) and REEL. The judgments were based on the actual amount that Kentucky players lost on PokerStars' websites. As that court succinctly—and correctly—stated:

> Here, the Defendants reached into Kentucky in willful violation of its laws, and for over four and a half years, invited over 34,000 Kentucky players to place over 246,000,000 bets, at least 10 million of which resulted in losses of five dollars or more. In part due to the profit earned during that four-and-a-half-year period. PokerStars grew to the point that by 2014, it could be sold to Amaya for $4.9 billion dollars. While part of the Defendants' profit came at the expense of Kentucky players' calculable losses incurred while playing the defendants' illegal online games, another part of their profits came at the incalculable expense of the violation of Kentucky's laws. For even when Kentucky players won, the defendants still took a rake. And with the money that the defendants took from Kentucky's players, it was able to invest and expand its illicit operations making themselves all the more profitable.

5

PokerStars appealed and the Court of Appeals reversed the trial court, holding the Commonwealth lacked standing, as it did not qualify as "any other person." The Commonwealth filed a motion for discretionary review which we granted. PokerStars filed a cross-motion, raising other issues not addressed by the Court of Appeals. Specifically, PokerStars now argues: (1) the Court of Appeals should be affirmed, as the Commonwealth is not "any other person" under the Loss Recovery Act; (2) PokerStars could not be sued under the statute, as they were not the "winner" in any of the illegal real-money poker games; (3) the trial court imposed the wrong amount of damages for various reasons; (4) the judgment violates PokerStars' Due Process rights; (5) the Commonwealth's failure to allege specific players, dates, money lost and players violates required pleading under Kentucky Rules of Civil Procedure (CR) 8; and (6) allowing the Commonwealth to sue under the Loss Recovery Act to recover money lost in gambling goes against statutory limitations on the state's forfeiture powers. We granted PokerStars' cross motion, and now reverse the Court of Appeals and reinstate the well-reasoned judgment of the Franklin Circuit Court.

## II. ANALYSIS

### A. The Commonwealth Qualifies as a 'Person' under Kentucky's Loss Recovery Act.

The Court of Appeals held the Commonwealth of Kentucky did not qualify as a person under Kentucky's Loss Recovery Act. Rather, that court would limit the term to a natural person. However, this interpretation does not follow our guideposts of statutory interpretation. We have held: "the plain

6

meaning of the statutory language is presumed to be what the Legislature intended, and if the meaning is plain, then the court cannot base its interpretation on any other method or source." *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005) (internal quotation marks and citation omitted). Further, "we assume that the Legislature meant exactly what it said, and said exactly what it meant." *Id.* (internal quotation marks and citation omitted). Therefore, "we must look first to the plain language of a statute and, if the language is clear, our inquiry ends." *Univ. of Louisville v. Rothstein*, 532 S.W.3d 644, 648 (Ky. 2017). The language here is clear.

The Loss Recovery Act does not define the word "person"; however, our general definitional statutes do. KRS 446.010(33), states "**unless the context requires otherwise** . . . 'person' may extend and be applied to bodies-politic . . . ." (Emphasis added.) While the statute does not *require* the term "person" extend to political bodies in *all* circumstances, the statute gives the parameters—within its plain language—in which a court may exercise its discretion: only *when the context requires otherwise*. The context does not require otherwise in the case at bar.

Nothing in the text of KRS 372.040 mentions or even suggests that the statute is limited to "natural persons." On the contrary, the General Assembly chose to modify the noun "person" with the adjective "any" — "any other person." This Court's predecessor held that the word "any" means "one indiscriminately of whatever kind or class; one, no matter what one" and "is an indefinite pronominal adjective . . . used to designate objects in a general way

7

without pointing out any one in particular." *Elliott v. Pikeville Nat'l Bank & Trust Co.*, 128 S.W.2d 756, 761 (Ky. 1939) (internal quotation marks and citation omitted). By using the phrase "any other person," the General Assembly plainly expressed that it meant to confer standing on all the kinds and classes of "person[s]" listed in KRS 446.010(33) without exception.

We have long held, "[i]t is an elementary rule of construction that effect must be given, if possible, to every word . . . of a statute." *Hampton v. Commonwealth*, 78 S.W.2d 748, 750 (1934) (citing *United States v. Standard Brewery*, 251 U.S. 210, 40 (1920)). Giving effect to the Legislature's use of the word "any," there is no interpretation of this statute that excludes the Commonwealth from having standing to sue.

The basis for resolving the question of whether the state is a person under the statute is not a determination left to the court's discretion. Courts are required to follow the clear language of the statute. Interpretation of the statute and the tools for such interpretation are only used when the statute is ambiguous. Courts are not free to interpret the statute according to their own preferences or inclinations. KRS 446.010 clearly states that a person may include bodies politic "**unless the context requires otherwise.**"

### 1. *Cases in which Statutory Context Compels Courts to find the State is not a Person*

At times, the context of a statute clearly requires the word "person" to be interpreted to exclude the state. Some examples of this context include *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989)*; Omosegbon v. Wells,* 335 F.3d 668, 673 (7th Cir. 2003); and *Hamilton v. Knight,* 1:17-CV-04714-

8

TWP-TAB, 2018 WL 928287, at *4 (S.D. Ind. Feb.16, 2018). Each of these cases holds that the state is not a "person" that can be sued under 42 U.S.C. § 1983. In those instances, the courts were curtailed from interpreting the word "person" to include the subject states, because the states had sovereign immunity; the states' sovereign immunity could only be waived if clearly and specifically stated. Since § 1983 does not clearly and specifically waive states' sovereign immunity, the context in those cases required a determination that the word "state" not be interpreted as "person" for purposes of the statutes. Since the Commonwealth was the plaintiff in the instant action, the context of KRS 372.020 does not require that the state be excluded from the definition of "any person" under the statute.

Further, PokerStars misplaces its support on *Will v. Michigan Department of State Police*, 491 U.S. 58, for the position that "person" does not include the state under KRS 372.040. We must consider the context of that case before jumping to such a broad, sweeping conclusion of law. *Will* involved § 1983 of the Civil Rights Act of 1871, and how it "provides a federal forum to remedy many deprivations of civil liberties"; this put the states' sovereign immunity at issue in the case. *Id.* at 66.

The United States Supreme Court explained "[t]he Eleventh Amendment bars such suits unless the State has waived its immunity, or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity." *Id.* (internal citation omitted). Importantly, it further clarified "**if Congress intends to alter the 'usual constitutional balance**

9

**between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear** in the language of the statute'" *Id.* at 65 (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)) (emphasis added). Finally, it explained "[w]e cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent." *Id.* at 67.

Much to the contrary, the case at bar does not involve the Commonwealth's sovereign immunity (or even contemplate a case in which the Commonwealth is a defendant). This case involves the Commonwealth bringing a civil suit to remedy a wrong done to its people—and thereby deterring illegal activities. Even if we were to assume the common usage of "person" does not include the Commonwealth, our General Assembly has spoken otherwise in KRS 446.010(33), which allows the Commonwealth to be considered a "person."

PokerStars also relies upon other distinguishable cases in arguing the Commonwealth is not a "person" with standing to sue under the statute. One such case is *Commonwealth v. Illinois Central Railroad Co.*, 153 S.W. 459, 462 (Ky. 1913). In *Illinois Central*, our predecessor Court determined whether a corporation could be charged with murder. The Court held that "[m]anifestly, a corporation cannot be indicted for a form of homicide, the only punishment for which is death or imprisonment; for, being an intangible thing, it cannot be subject to such penalties." The Court went on to observe that lesser forms of the crime might include a corporation if the Legislature were to provide a

penalty (at the time, the Legislature had not yet done so). In the century that has passed since that case, the Kentucky Legislature has established corporate penalties for the lesser crimes of first-degree manslaughter pursuant to KRS 507.030 and second-degree manslaughter pursuant to KRS 507.040. In *Illinois Central*, the context of the statute—the lack of any penalty that could be imposed on the corporation—required a determination that the corporation could not be considered a person under the statute. In the present case before the Court, the Commonwealth is the plaintiff and the statute provides an applicable penalty for the corporation being sued.

Another readily distinguishable case is *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997). In that case, the Seventh Circuit stated: "Loss Recovery Acts should not be interpreted to yield an unjust or absurd result contrary to its purpose." In *Vinson*, the casino sued by a losing gambler's mother was a legally-established casino under the laws of the state. Loss Recovery Acts were established to permit suits against *illegal* gambling operations. In the case at bar, the suit is against an illegal internet criminal gambling syndicate, which is clearly within the purpose of the statute in deterring illegal gambling.

### 2. Class of Persons

PokerStars argues we should employ a "class of persons" analysis and hold the Commonwealth of Kentucky is not a part of the "class of persons" authorized to sue under KRS 372.040. In relevant part, KRS 446.070 provides: "[a] person injured by the violation of any statute may recover." This statute

11

has been used by the Commonwealth to create standing when the particular statute under which the suit was initiated did not provide a specific cause of action. *See Commonwealth ex rel. Keck v. Shouse*, 245 S.W.2d 441 (Ky. 1952). *Shouse* involved a penal statute, so the Commonwealth used KRS 446.070 to have standing and bring the civil suit as a person injured by the penal violation.

The federal cases cited by PokerStars—*United States v. Kentucky National Insurance Co.*, 904 F.2d 708 (6th Cir. 1990) and *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208 (2d Cir. 2003)—are inapplicable to this issue as they are based on a separate statute from the Loss Recovery Act. In *Kentucky National Insurance*, the Sixth Circuit clarified "[the Unfair Claims Settlement Practice Act] does not provide the aggrieved party with a civil remedy and **therefore KRS 446.070 applies** to such a violation." 904 F.2d 708, *1 (6th Cir. 1990) (emphasis added). Then, in *Purdue Pharma L.P.*, that Court stated KRS 446.070 "establishes a general private right of action under state law." 704 F.3d at 215.

Here, since KRS 372.040 provides its *own statutory remedy* for violation of the civil statute, KRS 446.070 is neither necessary nor applicable. Therefore, since "person" is not defined in KRS 372.040, our general definitions for statutes—KRS 446.010—provides guidance for our Court. As previously noted, pursuant to that statute, "person" includes the Commonwealth.

12

### 3. *Commonwealth has Standing as an Extension of its Power to Prosecute Criminal Cases*

Furthermore, the Commonwealth of Kentucky is the entity that enforces the criminal laws of the Commonwealth. In the state's thirteen-year campaign under four different governors to stop illegal international internet gambling sites, the *only* successful effort came from freezing the money used for illegal gambling.

"The power to charge persons with crimes and to prosecute those charges belongs to the executive department, and by statute, is exercised by the appropriate prosecuting attorney." *Gibson v. Commonwealth*, 291 S.W.3d 686, 689–90 (Ky. 2009). Stated otherwise, the Executive Branch of the Commonwealth of Kentucky has exclusive jurisdiction to enforce the criminal laws of the state. In KRS 372.040, the Legislature expanded the criminal laws against gambling to allow standing for illegal gambling losers to file civil lawsuits against the winners to recover the amount they lost—and then went even further to deter illegal gambling by allowing "any other person" to bring suit if the loser had not done so within six months after sustaining the illegal gambling loss. This expansion of the criminal statutes against illegal gambling has the effect of deputizing any person—in effect, every citizen of the Commonwealth—to help with the enforcement of the criminal illegal gambling statutes by authorizing the filing of civil lawsuits to render the illegal gambling unprofitable. The Commonwealth (having the sole authority to enforce the criminal statutes) would not be excluded from a statute that expanded

13

enforcement against criminal activity by enabling "any person" to file civil lawsuits to deter the crime.

While the loser can only recover the amount he or she lost, "any other person" can recover *treble* damages. The fact that *any other person* may seek triple the recovery of the person who lost the funds displays the statute's intended deterrent effect. It is nonsensical to now interpret the statute in such a way that the Commonwealth—when it expanded the deterrent effect of its criminal laws into the civil realm with this statute—could not be a proper party to bring a civil lawsuit.

The Court of Appeals assigned greater importance on recovery by the losing gambler's family than the Commonwealth's recovery of loses and deterrence of illegal gambling. This purpose, while noble, is not within the plain language of the statute. Had the Legislature wished to narrow the class of persons who could recover treble the gambling losses or place the losing gambler's family in a separate class, it certainly could have done so. However, it did not; instead, it used the expansive language "any other person." We disagree with the Court of Appeals' conclusion that the context of the statute requires a ruling that the state lacks standing to render an illegal international internet criminal gambling syndicate unprofitable by seeking treble damages for losses sustained by Kentucky gamblers.

The Court of Appeals' opinion states that deterrence is one purpose of the Loss Recovery Act but allowing the Commonwealth to sue PokerStars "would completely contravene the other purpose of the Loss Recovery Act—to

14

allow those 'losers' to recover their losses and avoid becoming destitute as a result of a gambling problem." This assumes that the controlling purpose of the Loss Recovery Act is to prevent losers from becoming destitute. Under this theory, the state would be prevented from protecting the other citizens of the Commonwealth in order to prevent losers—who voluntarily participated in illegal gambling—from becoming destitute. Deterrence would be the logical and stronger purpose of the statute. This is reinforced by the language in the statute stating that after six months "any other person" may bring suit and recover treble damages. Any person other than the loser may recover treble damages, which encourages other persons to sue and take the profit out of illegal gambling. The statute gives a six-month grace period for losers to sue. It would be wrong of this court to expand the loser's preference in a suit beyond what the Legislature provided. Whatever purpose the statute has, our interpretation must be guided by the plain language that says the suit may be brought by "any other person." Person includes the state unless the context of the statute requires otherwise. The context of the statute requires a determination that the Commonwealth of Kentucky has standing to bring this lawsuit.

### 4. *The Commonwealth can Sue under Civil Laws to Protect its Citizens*

The Court of Appeals' opinion in this case states that "[w]e cannot accept that the Commonwealth must be incentivized with the promise of treble damages before it can be expected to bring suit to enforce its own laws." This statement seems to attribute a motive of profit in the Commonwealth's actions.

15

Any ignoble assumption as to motive is obviously false, as it ignores several key facts, such as: the Commonwealth has a right to protect its citizens; a penalty that takes the profit from illegal gambling operations is an effective tool to protect Kentuckians; the Commonwealth started studying this problem in 2007; the state's first lawsuit was filed in 2008 to prevent illegal internet gambling by suing to prevent the use of the domain names of the internet illegal gambling websites; the website is run from the Isle of Man, and the founder of the site has been a fugitive from a federal warrant for nearly a decade. If the federal government is unable to capture and bring the founder before the federal justice system, then it is obviously beyond the ability of the Commonwealth of Kentucky to bring the illegal gambling criminal syndicate and its founder before the courts of the Commonwealth of Kentucky to answer criminal charges. KRS Chapter 372 is the best (and perhaps the only effective) tool for dealing with this insidious problem.

As our predecessor Court stated in a case involving a civil action brought by the Commonwealth against a gambling house, "[t]o say that a court of equity may not enjoin a nuisance of this sort, when the criminal laws have proven inadequate, is to say that the commonwealth is unable to protect its citizens." *Goose v. Com. ex rel. Dummit*, 205 S.W.2d 326, 329 (Ky. 1947) (internal quotation marks and citation omitted). Just as we refused to disallow the Commonwealth to protect its citizenry almost three-quarters of a century ago, we decline to do so today. The existence of a criminal statute does not prevent the Commonwealth from suing civilly.

16

Some criminal entities are so strong, organized, and insidious that they are almost impossible to deal with using traditional police tools and methods. Criminal syndicates operating internet websites from distant countries are an extremely difficult problem. These overwhelming problems have led to the state and federal government adopting new approaches in their statutes. The federal government passed Title IX of the Organized Crime Control Act of 1970, better known as the Racketeer Influenced and Corrupt Organization Act (RICO). The Supreme Court of the United States has recognized: "[i]t is the purpose of this Act to seek the eradication of organized crime in the United States . . . by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." *Russello v. United States*, 464 U.S. 16, 27 (1983) (citation and internal quotation marks omitted). In 2006, Congress enacted the Unlawful Internet Gambling Enforcement Act, a powerful tool for prosecution of illegal internet gambling. 31 U.S.C. §§ 5361-5367.

The Commonwealth of Kentucky passed KRS 506.120, entitled "[e]ngaging in organized crime," in 1978. Subsection (4) of that statute provides that:

> [a]s used in this section, 'criminal gang syndicate' means three (3) or more persons acting as a part of or members of a criminal gang in collaborating to promote or engage in any of the following on the continuing basis: . . . (d) any gambling offense as defined in KRS 411.090, KRS chapter 528, or section 226 of the Constitution . . . .

Under this statute, the corporate defendant's fine may be up to double the defendant's gain. KRS 500.090(2) provides that "[m]oney which has been obtained or conferred in violation of any section of this code shall, on

17

conviction, be forfeited for use of the state[;]" Kentuckians lost at least $290,230,077.94 that would be forfeited to the State under the statutes. If that amount is added to a potential fine of double the defendant's gain it would total $870,690,233.82—the exact amount that the court awarded in the final judgment in this case. This makes it clear that the judgment in this case is an appropriate amount to deter illegal gambling by a criminal syndicate rather than some incentive for the Commonwealth "to enforce its own laws."

### 5. PokerStars' Illegal Online Gambling Harms the Commonwealth

The Court of Appeals' contention that the Legislature intended victims' families—to the exclusion of the Commonwealth—to recover these treble damages is ill-conceived. The loser has exclusive rights to sue within six months of payment of his losses from the winner or his transferee under the provisions of KRS 372.020. "Any person entitled to recovery under KRS 372.020 may have discovery and relief in equity; but when such relief is obtained, the winner shall be discharged from all penalty and forfeiture for having won the money . . . ." KRS 372.030. Under the provisions of KRS 372.040, "any other person may sue the winner" if the loser or his creditor does not within six months after payment or delivery to the winner.

If the loser or his creditor sues, then the Commonwealth's right to proceed against the winner or his transferee is extinguished. PokerStars failed to assert the defense that anyone had ever successfully sued to recover any money lost on their website in any wager. In the statute, the Legislature clearly provided for action against the winner by providing that only the loser could file

18

a lawsuit against the winner for the first six months. Any restrictions on who could file after six months is in clear contradiction with the plain language of the statute.

According to the Court of Appeals' logic, the statutory language allows a stranger to the illegal gambling transaction to recover so long as he or she is a "natural person." There is no requirement the triple recovery benefit *anyone* who was harmed by the gambling loss. As noted, the Legislature could have easily limited recovery to the family of the gambler; however, it did not. As it is, the Court of Appeals' decision would restrict a person (the Commonwealth) who *has* suffered tangible harm due to the gambling losses of its citizens from recovering under the statute.

In *Purdue Pharma*, 704 F.3d 208, the federal court recognized the state could sue to recover for damages done to its citizens. This trend is followed by many states in attempting to deal with the drug epidemic. The Commonwealth of Kentucky also received money as compensation from a federal lawsuit against the tobacco companies for damages done to its citizens. As this Court has explained:

> To resolve threatened litigation, forty-six states, six other jurisdictions and several tobacco companies entered into a Master Settlement Agreement, (MSA). An element of the agreement provided that the Commonwealth of Kentucky would receive $3.45 billion over a period of twenty-five years. By the terms of the agreement, the Commonwealth of Kentucky was required to file suit naming Phillip Morris, Inc., Brown & Williamson Tobacco Corp. (individually and as successor by merger to The American Tobacco Company), Lorillard Tobacco Company, R.J. Reynolds Tobacco Co., Liggett Group, Inc., and United States Tobacco Company, (Tobacco Companies), as defendants. The lawsuit was filed in the Franklin Circuit Court and was dismissed by agreement

19

> with prejudice three days later. The Circuit Court entered a Consent Decree and Final Judgment approving the M.S.A. and retaining jurisdiction over the case to ensure compliance.

*Arnold v. Commonwealth ex rel. Chandler*, 62 S.W.3d 366, 367–68 (Ky. 2001).

Even assuming the General Assembly's intent was to limit recovery to victims, there is no doubt the Commonwealth of Kentucky is harmed by illegal internet gambling. The Commonwealth *is* the people—and Kentuckians and their families are harmed by the impact of illegal gambling, not to mention the government funds that have been expended to address the societal and fiscal harm caused by PokerStars.

A report on a 2008 telephone survey conducted by the University of Kentucky Survey Research Center indicated there were 9,000 addicted gamblers, 51,000 problem gamblers, and 190,000 who were at risk of developing a gambling addiction in Kentucky. In fact, the "social cost to Kentucky from gambling addiction" is a minimum of $81,000,000 per year. Annual Report, Kentucky Council for Problem Gambling, Out of the Shadows, Problem Gambling: From Hidden Addiction to Public Awareness (Dec. 14, 2020), https://www.kycpg.org/wp-content/uploads/2017/05/20th-Annual-Report-1.pdf. This estimate is based on the minimum estimated social harm by the 9,000 addicted gamblers without consideration of any increase caused by the ease of availability of gambling on PokerStars internet website or the 51,000 problem gamblers and 190,000 at risk of developing gambling addiction. The gamblers who developed an addiction while using the

20

PokerStars website are likely to be an ongoing cost of the state for years after PokerStars ceases operations in Kentucky.

In 1996, the United States Senate Committee on Governmental Affairs held a hearing based on the findings of the Gambling Impact Study Commission. The Senate particularly considered the impact of gambling on teenagers and young adults. "[G]ambling is the fastest growing teenage addiction, with the rate of pathological gambling among high school and college-age youth about twice that of adults." *Id.* According to Howard J. Shaffer, director of the Harvard Medical School Center for Addiction Studies, "there are more children experiencing adverse symptoms from gambling than from drugs . . . and the problem is growing." *Id.*

The laws in Atlantic City restrict casino gambling to people twenty-one years of age or older. In spite of these laws, a survey of teenagers at Atlantic City High School revealed that 64% had gambled in a local casino. Even more shocking, 40% had done so before the age of fourteen. *Id.* Atlantic City casino security personnel report ejecting about 20,000 minors every year. *Id.* When you add the attractiveness of quick, easy-access internet gambling to the fact that the victims of problem gambling or gambling addiction are younger and younger, you end up with a recipe for disaster in the Commonwealth.

Problem gamblers and gambling addicts, desperate to pay off mounting gambling debt, often turn to the commission of felonious financial crimes such as "embezzlement, check kiting, tax evasion, and credit card, loan, and insurance fraud." *Id.* The cost to the Commonwealth just to incarcerate the

21

perpetrators would be astronomical.  A Florida study conducted to evaluate the impact of legalizing casinos found, "[n]ot counting the cost of prosecution, restitution, or other related costs, incarceration and supervision costs alone for problem gambler criminal incidents could cost Florida residents $6,080,000,000." *Id.*

Often, the state must use its limited resources to help individuals and their families who have lost funds to illegal gambling through social welfare programs.  From the bankruptcy or death by suicide of its citizens to otherwise law-abiding citizens turning to crime to keep up their gambling addictions, the Commonwealth has certainly faced real and tangible harm from PokerStars' *years* of illegal internet gambling in the state.

The statute allows *any* person apart from the loser to sue to recover three times the amount lost to illegal gambling.  How, then, could the Commonwealth of Kentucky be excluded from suing to protect both its citizenry and its public purse?  Indeed, it is difficult——if not outright impossible—to imagine any loser on the PokerStars internet site who would have the money, resources, and time to sue PokerStars, particularly when it is located on the Isle of Man and its founder has been a fugitive from justice under indictment from the United States for nearly a decade.

**B. PokerStars was a "Winner" in the Poker Games.**

As is apparent from the plain language of the statute, and as our predecessor Court has held, "[u]nder the terms of the statute, in order for appellant to recover . . . it was incumbent upon him to show that Goodman

22

was the 'winner' of the money lost by him . . . ." *Tyler v. Goodman*, 240 S.W.2d 582, 584 (Ky. 1951). As the Seventh Circuit Court of Appeals has acknowledged: "They say the house always wins." *United States v. Hill*, 818 F.3d 289, 291 (7th Cir. 2016). This is a widely recognized fact—casinos and online poker sites like PokerStars would not exist if they were not "winners." While PokerStars admits it took a percentage from the wagers in each of the poker games, it disputes that taking a rake makes it a "winner" under KRS 372.040. However, our predecessor Court ruled otherwise long ago—and the reasoning is as apt today as it was one hundred thirty years ago:

> It is not satisfactorily proven that either of the appellees ever won any money from the appellant by playing with him, but it does satisfactorily appear from the evidence that the appellees, as partners, owned and run the poker-room on the corner of Sixth and Market streets, at which the appellant played poker with divers[e] gentlemen assembled there for that purpose; and at each game a certain per cent. of the winning was taken by the appellees, out of which was defrayed the expenses of the players for suppers, cigars, etc., and the balance of the per cent., sometimes amounting to as much as $50 a night, went to the appellees, as partners, as profits. This per cent., or "take out," as it is called, is a part of the loser's losses. So the question is, does the taking of this per cent. make the appellees jointly interested in the winnings as wrong-doers, so as to make them winners of the appellant's money in the sense of the statutes, supra? We do not understand that the winner, in the sense of said statutes, must be one of the players with cards in his hands; but if he is to receive a per cent. of the winnings by the actual player, he is, in the sense of the statute, a winner. According to an arrangement with the players and himself, he is to receive a part of the winnings as his profits. Why should he not be regarded as a winner in the sense of the statute? He certainly has a community of interest in the stakes with whoever wins; and this interest is the result of an arrangement with all the players, and this arrangement and division makes him a joint wrong-doer with the winner, it makes no difference which one it may be. If by an arrangement the winning was divided between the actual player and another, there is no doubt that the latter would be responsible as a joint wrong-doer for the whole sum won as a

23

winner. Here the arrangement does not make him a partner with any particular player as against the others; but it does make him jointly interested with the winner, in the stakes. It is true that he may be indifferent as to which will be the winner; but as soon as one or the other has won, the arrangement gives him a joint interest in the winnings with the actual player, which makes him, in the sense of the statute, a winner. It is not to be understood that the actual winner cannot recover from him said per cent. of his own stakes; but this is so because the statute gives the remedy against him in the sense that he is a winner, even from the successful player; but nevertheless he is jointly interested with the winner in the loser's losses, which makes him responsible for them as a wrong-doer. It is not the extent, but the community, of interest that makes wrong-doers responsible for the whole wrong. If each is to receive a certain amount of the result of the unlawful enterprise, this gives them such a community of interest as to render each responsible for the whole amount received.

*Triplett v. Seelbach*, 14 S.W. 948, 949 (Ky. App. 1890).

Seven years later, our predecessor Court faced the same issue in *White v. Wilson's Adm'rs*, 38 S.W. 495, 496–97 (Ky. 1897). There, we held: "[i]n our judgment, appellant was a joint wrongdoer with the winners . . . , in that he had an interest in the winnings, no matter how small. . . . [I]f Wilson had paid his losses at the time they were incurred to the various winners, he might have recovered them from White." *Id.*

The statute the Court interpreted in *Triplett* and *White* is identical to that in the present case. In *Triplett*, the partners took a percentage of the winnings—just as PokerStars does. In *White*, it was a manager who acted in concert with a gambler. Just as in *Triplett* and *White*, the persons who took the percentage were sued rather than the poker players in the game. The only discrepancy between the cases is that, in the case at bar, the Commonwealth is the "person" suing to recover the amounts lost. Since we have already

24

determined the Commonwealth is a "person" pursuant to the statute, this is a distinction without difference.

PokerStars fails to cite any contradictory precedent on this issue from this Court or its predecessor. Instead, it cites to a federal district court in New Jersey which held in an unpublished case, "[i]n Kentucky, only the "winner" of money from a gambling loser is liable under the statute." *Humphrey v. Viacom, Inc.*, 06 2768 DMC, 2007 WL 1797648, at *10 (D.N.J. June 20, 2007) (citing *Tyler v. Goodman,* 240 S.W.2d 582, 584 (Ky. 1951)). However, in spite of this citation, our predecessor Court did not depart from its precedent in *Tyler.* Rather, in that case, the Court made it clear that only "winners" may be sued under the statute but did not change the definition of winner Kentucky's courts has followed for over 100 years—the house taking a rake or percentage of the pot is a winner. There was simply no proof the individual sued (Goodman) was a winner. As the Court stated:

> There was no attempt to show that Goodman paid the rent on the premises used as the handbook, or that he owned any of the gambling paraphernalia, or exercised any control or supervision over the gambling operations. There is no testimony that he was ever in the gambling quarters, or that he accepted any of appellant's bets, or received any of the money lost by appellant.

*Id.* at 583.

Further relying on our precedent that a party who takes any part of a rake is a winner, we continued with our analysis in *Tyler,* concluding, "in the absence of proof that he received, **either directly or indirectly, some part of the money lost by appellant**, the court was not authorized to enter a

25

judgment against him." *Id.* at 584 (emphasis added). Whatever point the New Jersey federal district court was making by its reliance on *Tyler*, the case did not change the definition of winner followed by Kentucky courts for over one hundred years. Based on PokerStars' conspiracy with the winning players to violate the laws of the Commonwealth of Kentucky, PokerStars is a winner under the Loss Recovery Act. We do not abandon precedent merely on the basis of its age and see no valid reason to reverse these cases today. PokerStars took a portion of the money lost by Kentuckians in the illegal online real-money poker games. Therefore, they were a "winner" under KRS 372.040.

Our Court has interpreted winners to include individuals who take any portion of the amount lost since at least 1890. PokerStars is charged with knowledge of the law. Both the plain language of our statutes and the precedent from our predecessor Court gave PokerStars notice of the state of the law in the Commonwealth.

> "There is a maxim as old as the law itself, ignorantia legis neminem excusat, 'ignorance of the law excuses no one', 42 C.J.S. page 380. This is a rule of necessity, otherwise ignorance of the law would furnish immunity from punishment for violations of the Criminal Code and immunity from liability for violations of personal and property rights.

*Freeman v. Louisville & Jefferson County Planning & Zoning Com'n*, 214 S.W.2d 582, 583 (Ky. 1948).

### C. Amount and Calculation of Damages

PokerStars makes several claims regarding the amount and calculation of damages awarded, including that the award violates the excessive fines and due process clauses of the United States and Kentucky Constitutions and that

26

the measure of damages violates Kentucky precedent. We disagree. First, as PokerStars points out, civil penalties are treated as fines for constitutional inquiries. *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Fines do not violate the excessive fines clause of the Eighth Amendment of the United States Constitution or Section Seventeen of the Kentucky Constitution unless they are disproportionate. *Id.* Here, the award was proportionate to the amount of money lost by Kentucky gamblers in five years on the PokerStars site. In fact, it is *exactly* that amount, times three, as calculated based on PokerStars' records. This "fine" is not excessive and is the very definition of mathematically proportionate.

PokerStars also argues its right to due process was violated, as the Kentucky law was not clear and presented an "open question." However, PokerStars' argument is belied by the fact that the statutes are clear that PokerStars actions were illegal, the violated the laws of the Commonwealth of Kentucky, and for over one hundred years the courts had defined taking a rake or percentage of winnings as being a winner under the Loss Recovery Act. PokerStars ignored a 2008 order from the Franklin Circuit Court ordering it to cease and desist internet gambling operations as to Kentucky-based players. Instead of obeying that court order, PokerStars continued its criminal enterprise to the detriment of Kentuckians until its assets were frozen by the federal government. Furthermore, it is clear both the past and current owners of PokerStars had full knowledge of a potential substantial recovery in Kentucky since the purchase contract included an indemnification clause

*specifically* referencing the Kentucky litigation. The fact that PokerStars did not believe Kentuckians actually *would* recover the funds to which they were statutorily entitled does not amount to a due process violation.

PokerStars also argues the manner in which the trial court calculated damages in this case was contrary to precedent. We disagree. Kentucky has *never* calculated an operator's "fine" in terms of its rake, as PokerStars now insists we must. The plain language of the statute states "any other person may sue the winner, and recover treble the value of the money or thing lost." That is precisely the amount of damages, based on PokerStars' own records, the trial court awarded.

PokerStars argues that if this Court will not base any award on the amount of the rake, we should base it on the amount the individual players' losses offset by their wins. While we would offset the parties' losses if they were both players, that is not the case herein. *See Elias v. Gill*, 18 S.W. 454 (Ky. 1892). Here, as noted above, PokerStars was a winner who took a percentage of the wagers in any given game. As such, it is liable for the entire amount lost. PokerStars argues this amounts to joint and several liability, which Kentucky has abandoned in favor of comparative fault. While we agree that is the case in *tort* claims, this is no such claim; and, as our precedent makes clear, the award is not based on the amount of the "winnings" claimed. It is based on the fact that PokerStars acted in concert with the winning player. PokerStars could have filed a claim against the winning players for the losses it incurred as a result of this suit; however, the statute of limitations has passed

28

for any such action. PokerStars refused to comply with discovery of the identity of the players for five years, which prevented the Commonwealth of Kentucky from suing the individual players until the five-year period for filing a lawsuit had passed. PokerStars' choices required that it pay the full amount under the Loss Recovery Act because it chose to form an illegal internet criminal gambling syndicate, violated court orders to stop, and hid the identity of the co-conspirators until they could no longer be sued under the Loss Recovery Act.

PokerStars argues it is improper for the Commonwealth to file one suit in which all the losses are aggregated without pleading specific facts about particular losses. However, there is no prohibition against this in either the statute or our caselaw. The amount of recovery was based on PokerStars' records regarding individual players' losses within a twenty-four-hour period, which is exactly what is envisioned by the statute.

We recently addressed Kentucky's pleading standard at length in *Russell v. Johnson & Johnson, Inc.*, 2019-SC-0118-DG, 2020 WL 6390218, at *4–5 (Ky. Oct. 29, 2020):

> "Kentucky is a notice pleading jurisdiction, where the 'central purpose of pleadings remains notice of claims and defenses.'" *Pete v. Anderson*, 413 S.W.3d 291, 301 (Ky. 2013) (citing *Hoke v. Cullinan*, 914 S.W.2d 335, 339 (Ky. 1995)). In accordance with Kentucky Civil Rule 8.01(1), "[a] pleading which sets forth a claim for relief ... shall contain (a) a short and plain statement of the claim showing that the pleader is entitled to relief and (b) a demand for judgment for the relief to which he deems himself entitled." As interpreted by this Court, "[i]t is not necessary to state a claim with technical precision under this rule, as long as a complaint gives a defendant fair notice and identifies the

29

claim." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005) (citing *Cincinnati, Newport, & Covington Transp. Co. v. Fischer*, 357 S.W.2d 870, 872 (Ky. 1962)).

Importantly, "[w]e no longer approach pleadings searching for a flaw, a technicality upon which to strike down a claim or defense, as was formerly the case at common law." *Smith v. Isaacs*, 777 S.W.2d 912, 915 (Ky. 1989). When reviewing a complaint to determine whether it states a cause of action, it "should be liberally construed." *Morgan v. O'Neil*, 652 S.W.2d 83, 85 (Ky. 1983). Our liberal pleading standard was recently demonstrated when we held that a complaint "couched in general and conclusory terms, complied with CR 8.01(1)." *KentuckyOne Health, Inc. v. Reid*, 522 S.W.3d 193, 197 (Ky. 2017).

Applying Kentucky's well-established notice pleading principles, we hold Appellant's complaint alleged a sufficient cause of action to survive a motion for judgment on the pleadings. We refuse to mandate a heightened pleading standard and, therefore, reiterate Kentucky's requirement of bare-bones, notice pleading.

Kentucky Civil Rule (CR) 8.01(1) allows just the sort of pleadings the Commonwealth filed below. Any information the Commonwealth lacked was due to PokerStars' withholding of information regarding the players and their wins and losses. The Commonwealth met our bare-bones notice pleading standards.

Finally, PokerStars argues:

Adopting the Secretary's view would raise significant constitutional and procedural fairness concerns, particularly in light of the U.S. Supreme Court's recent recognition that government use of fines and forfeitures as "a source of revenue" creates a temptation to impose them "in a measure out of accord with the penal goals of retribution and deterrence." *Timbs v. Indiana*, 139 S. Ct. 682, 689 (2019).

We are mindful that *Timbs* reiterates the Supreme Court of the United States' stance that the Excessive Fines Clause is applicable to the states. However, as

30

the fine was not disproportionate, there was no violation. Many of our statutes call for treble damages. This is not a disproportionate award.

The Commonwealth's recovery in this case is certainly not a windfall, as the Court of Appeals seems to assume; rather, it is a recoupment of some portion of the countless dollars the criminal syndicate has cost Kentucky collectively and Kentuckians individually. The Commonwealth of Kentucky suffered financial losses along with the tragic damage to its citizens. Mental and physical healthcare systems that care for the citizens harmed by the illegal gambling are supported in part by the state. Money sent to offshore gambling accounts is lost and the state deprived of the taxes to which it is entitled. The cost to prosecute and incarcerate individuals who resort to crime to support their gambling is a huge cost on Kentucky's strained and overextended penal system. The Commonwealth of Kentucky has losses due to PokerStars' illegal internet gambling criminal syndicate. The amount recovered in this case may not cover the actual cost suffered by the Commonwealth of Kentucky.

### III. CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals and reinstate the judgment of the trial court.

All sitting. Keller, Lambert, and Nickell, JJ., concur. VanMeter, J., dissents by separate opinion, in which Minton, C.J., and Hughes, J., join.

VANMETER, J., DISSENTING: I respectfully dissent. The majority opinion sets forth compelling policy reasons why we should reverse the Court

31

of Appeals and reinstate the Franklin Circuit Court judgment. While I might agree with many of those policy reasons, the remedy sought must be authorized in the statutes enacted by our legislature. In *Tyler v. Goodman*, 240 S.W.2d 582, 584 (Ky. 1951), our predecessor court noted that "appellant's right to recovery depends solely on [statutory authority]. At common law money lost at gaming could not be recovered." (citing *Craig v. Curd*, 309 Ky. 549, 218 S.W.2d 395 (1949)).

This case involves an issue of statutory construction: whether the Commonwealth of Kentucky qualifies as a "person" under KRS 372.010 to 372.050,[2] specifically KRS 372.040, to have standing to bring a third-party claim against online gambling companies.

The portions of the Act upon which the Commonwealth relied in bringing suit include KRS 372.020, which provides a losing gambler with a first-party cause of action to recover any losses suffered. It states:

> If any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery. Recovery may be had against the winner, although the payment,

---

[2] These statutes have been referred to as Kentucky's Loss Recovery Act. This designation is perhaps misleading in view of their historic origins. Statutes prohibiting gambling, or gaming, came to Kentucky via its Virginia parentage. *See* 1 Morehead & Brown, Digest of the Statute Laws of Kentucky (1834) 749 (An Act to suppress excessive Gaming. Henning Stats. at Large, vol. X, p. 205). The ability of the loser, or any other person, to sue to recover the losses was statutorily authorized at least as early as 1798. 2 Littrell, Statute Law of Kentucky 103 (1810). The statutes now comprising KRS 372.010 to 372.050 are almost verbatim reenactments of provisions contained within the legislature first codification of the Commonwealth's statutes. Rev. Stat. ch. 42 §§ 1-5 (Ky. 1852).

transfer or delivery was made to the endorsee, assignee, or transferee of the winner.  If the conveyance or transfer was of real estate, or the right thereto, in violation of KRS 372.010, the heirs of the loser may recover it back by action brought within two (2) years after his death, unless it has passed to a purchaser in good faith for valuable consideration without notice.

KRS 372.020.

If a losing gambler fails to bring a recovery action under KRS 372.020 within six months, KRS 372.040 permits a third-party cause of action for "any other person" and allows for the recovery of treble damages.  It states:

> If the loser or his creditor does not, within six (6) months after its payment or delivery to the winner, sue for the money or thing lost, and prosecute the suit to recovery with due diligence, **any other person** may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment.

KRS 372.040 (emphasis added).

KRS 372.020 is virtually identical to the version enacted by the legislature in 1852.  *See* Rev. Stat. ch. 42, § 2 (Ky. 1852).  KRS 372.040 has a similar provenance in Rev. Stat. ch. 42 § 4 (Ky. 1852), with one notable exception.  The 1852 version provided:

> If such loser or his creditor do not sue for the money or thing lost, within six months after its payment or delivery, and prosecute the suit to recovery with due diligence, any other person may sue the winner and recover treble the amount or value of the money or thing lost, if suit be so brought within five years from the delivery or payment.
>
> **One-half of what is so recovered shall be for the person suing, and the other half for the commonwealth.** The loser, creditor or other person first suing, after the six months, to have the preference, if the suit be prosecuted to recovery with due diligence.

In 1873, the legislature amended the gaming statutes to delete from this section the recovery benefit to the Commonwealth. Gen. Stat. ch. 47, Art. I, § 4. That same year, it amended the gambling forfeiture statute to mandate that all seized property be retained by the Commonwealth, as opposed to the prior version that allowed a private seizor to retain half of the seized property. *Compare* Rev. Stat. ch. 42 § 6 (Ky. 1852) *with* Act of 1873, Gen. Stat. Ch. 47, Art. 1, § 6 (Bullitt & Feland 1877). The legislative intent for both amendments would seem to clarify the available recovery: it saw fit to provide exclusively to the Commonwealth the certain recovery of money or tangible items seized under the forfeiture provision, while providing the less certain recovery, following a lawsuit, to private persons. Had the legislature intended to confer on the Commonwealth standing to sue or collect under the recovery section, it could have easily done so.[3]

This interpretation is supported by *Perrit v. Crouch*, 68 Ky. 199 (1868). In *Perrit*, a father and the Commonwealth brought a joint action under Rev. Stat. ch. 42, § 4 [KRS 372.040] to recover the son's gambling loses. This was before the 1873 amendment, so that the Commonwealth was entitled to one-half of

---

[3] Just as the gambling recovery statutes have continued to the present, so have the property seizure statutes. KRS 500.090(2) provides that "[m]oney which has been obtained or conferred in violation of any section of this code shall, upon conviction, be forfeited for use of the state[;]" KRS 528.020 and KRS 528.030 make it illegal to knowingly advance or promote illegal gambling; and KRS 528.100 provides that gambling devices or records used in illegal gambling be forfeited to the Commonwealth. *See also Gilley v. Commonwealth*, 312 Ky. 584, 587, 229 S.W.2d 60, 63 (1950) ("Money may be subject to seizure along with gambling devices, when the circumstances make it clearly apparent the money formed an integral part of the illegal gambling operation[]").

34

any recovery. Apparently, the defendant challenged the joint petition, as to which the court held: "[t]here is no misjoinder in the petition. The relator and the Commonwealth being equally entitled to the recovery, the joinder of both as co-plaintiffs was proper[.]" 68 Ky. at 205. In other words, after the legislature amend the statute in 1873, the Commonwealth, no longer being entitled to any recovery, was no longer a proper plaintiff.

KRS 446.010 provides definitions for statutes generally, to assist in construing statutes where the words are not otherwise defined. It states in relevant part, "[a]s used in the statute laws of this state, unless the context requires otherwise: . . . (33) "Person" **may** extend and be applied to bodies-politic and corporate, societies, communities, the public generally, individuals, partnerships, joint stock companies, and limited liability companies[.]" (emphasis added). "May" is clearly permissive. KRS 446.010(26); *Hardin Cty. Fiscal Court v. Hardin Cty. Bd. of Health*, 899 S.W.2d 859, 861 (Ky. App. 1995) (holding that "[i]t is elementary that 'may' is permissive"). While the majority opinion states that the legislature "plainly expressed that it meant to confer standing on all the kinds and classes of 'person[s] listed in KRS 446.010(33) without exception[,]" our case law has not recognized that broad interpretation. In *Moore v. Settle*, 82 Ky. 187 (1884), a wife sued under Gen. Stat. ch. 47, art. 1, § 4 [KRS 372.040] to collect her husband's gambling losses. Clearly, she was a person to whom the statute should provide a remedy. However, and

35

notwithstanding the broad language of "any other person," the court held that a married woman had no right to sue in her own name.[4]

"The cardinal rule of statutory construction is that the intention of the legislature should be ascertained and given effect." *Cabinet for Human Res., Interim Office of Health Planning & Certification v. Jewish Hosp. Healthcare Servs., Inc.,* 932 S.W.2d 388, 390 (Ky. App. 1996). Additionally, when the language of a statute is clear and unambiguous on its face, we are not free to construe it otherwise even though such construction might be more in keeping with the statute's apparent purpose. *Whittaker v. McClure,* 891 S.W.2d 80, 83 (Ky. 1995). "We presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes." *Shawnee Telecom Res., Inc. v. Brown,* 354 S.W.3d 542, 551 (Ky. 2011). And "[w]e presume that the legislature intends to make a change in existing law by enacting an amendment." *Smith v. Teachers' Ret. Sys.,* 515 S.W.3d 672, 678 (Ky. App. 2017).

The majority opinion largely ignores the historical context and case law interpreting KRS 372.010 to 372.050, which, save for the important 1873 amendment, are virtually unchanged since the 1852 statutory codification. The historical context of the loss recovery section, KRS 372.040, demonstrates

---

[4] Admittedly this decision was rendered when women's property rights were restricted, but it still demonstrates the broad interpretation advocated by the majority opinion is erroneous. This holding, furthermore, occurred despite the virtually identical statutory definition of "person" as contained in KRS 446.010(33), that permissibly "may extend and be applied to bodies-politic and corporate, societies, communities, and the public generally, as well as individuals." Gen. Stat. ch. 21, § 12 (Ky. 1879).

that the legislature had originally established an illegal gambling prevention regimen to spread benefit between private individuals and the Commonwealth. The legislature, in the 1870s, changed that regimen, and that structure has continued to the present in KRS 372.010 to 372.050. Since the legislature deleted the recovery in favor of the Commonwealth, we are not at liberty to reinsert it under the guise of statutory construction now. I therefore conclude that within the context of these statutes, the word "person" only refers to natural persons and does not include the Commonwealth as a body-politic.[5]

I would affirm the Court of Appeals decision.

---

[5] This interpretation is further supported by the fact that no one, not the majority, the trial court, or the Commonwealth, has cited, and we have not found, any case from 1873 until this case was filed in 2010 in which the Commonwealth filed an action under KRS 372.040 seeking recovery.

COUNSEL FOR APPELLANT/CROSS-APPELLEE:

James Lee Deckard
William Cecil Hurt, Jr.
William Harvey May
Hurt, Deckard & May, PLLC


COUNSEL FOR APPELLEE/CROSS-APPELLANT:

Sheryl G. Snyder
Griffin Terry Sumner
Theresa Agnes Canaday
Jason Patrick Renzelmann
Frost Brown Todd LLC